**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT SULAK, | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 4:20-cv-03715 |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| BASF CORPORATION | § | |
| Defendant | § | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robert Sulak now responds to Defendant BASF Corporation's Motion for Summary Judgment ("Motion"). The Motion should be denied. In support Sulak states as follows.

**PRELIMINARY STATEMENT**

In June 2018, a BASF intern named Emily Ochoa shared with Plaintiff Robert Sulak that Sulak's boss, a manager named Mark Screen, was sexually harassing her. Feeling duty-bound to assist, Sulak called BASF's corporate compliance hotline to report it. He later let Ochoa use his office so she could call the hotline herself. Three months later, BASF cleaned house. On September 12, it fired Screen for a pattern of sexually harassing conduct towards multiple women. And on September 13, Plant Manager Judy Brinkman called Sulak to her office and fired him. This all happened one week after Brinkman threatened plant employees with "consequences" for making reports to corporate HR, and two days after Sulak had gone to Brinkman with concerns about her threatening employees from making protected complaints.

Sulak has sued for this obvious retaliation, but BASF has chosen to spin the summary judgment wheel anyway. Though admitting that both the hotline call and September conversation with Brinkman were protected activities (Motion, p. 21), it nonetheless argues that Sulak has no proof that he engaged in protected activity. It argues that he cannot establish a prima facia case of

causation, even though less than three months had passed since the hotline call and two days since the Brinkman conversation.  And it argues that Plaintiff has no evidence of pretext, even though its excuse is that Sulak failed to satisfy a performance improvement plan that he had successfully completed nearly a month earlier.  Defendant's motion should be denied.

<u>FACTS</u>

**A.     Sulak's Employment with BASF**

Sulak, a chemical engineer, accepted a job at a Staff Operations Engineer position at a BASF plant in Beaumont in early January 2014.  Exhibit 1, Deposition of Robert Sulak, ("Sulak Depo,), pp. 12-13; Ex. 2; Ex. 3, Deposition of Judy Brinkman ("Brinkman Depo."), p. 24.  At the time, Sulak had 19 years of experience working as an engineer.  Exhibit 4, Declaration of Robert Sulak ("Sulak Dec."), ¶ 3.  Judy Brinkman served as the Beaumont Site's Director from 2017 to 2020.  Brinkman Depo., pp. 14 and 17; Exhibit 5, Brinkman Affidavit, ¶ 1.

Sulak started at the plant's Dicamba Unit in February 2014.  Sulak Dec. ¶ 4.  In July 2017 he was moved to the Formulations, Filling, and Packaging Unit, also known as FFP.  *Id.*; Sulak Depo., p. 134.  He reported there to Mark Screen beginning on July 1, 2017.  Sulak Depo., p. 134-35.  Following the transfer, Screen told Sulak that he considered Sulak to be meeting expectations.  *Id.* at 132.  But, he said that the prior supervisor, Lane Lostak, had given Sulak a 'Does Not Meet' expectations and, therefore, Screen was not going to give Sulak a good overall evaluation.  *Id.* at 132-33.  Sulak asked what he needed to do and Screen merely replied "Just work harder."  *Id.* at 133.  Sulak asked for better guidance on that and Screen told him to "get with Clay".  *Id.*  This was a reference to Clay Gilbert, the FFP Execution Manager.  *Id.* at 150.

**B.     Sulak Assists Emily Ochoa in Making a Report of Sexual Harassment Against Mark Screen Through the Corporate Compliance Hotline**

In 2018, BASF hired Emily Ochoa as a student intern to work in Mark Screen's group for

2

the summer.  Brinkman Depo., p. 26.  They assigned Sulak to be her mentor.  Sulak Dec., ¶ 5, Ex. 6.[1]  In June 2018, Ochoa told Sulak him that their supervisor, Mark Screen, was making unwanted advances towards her.  Sulak Dec., ¶ 6, Ex. 6.  She described an occasion where he contrived a reason to meet with her alone near the waste wells behind the plant and then made advances towards her after she met him there.  Sulak Dec., ¶ 6, Ex. 6.  Sulak knew that under company policy he had an obligation to report the harassment on Ochoa's behalf.  Sulak Dec., ¶ 8.   So shortly thereafter (in late June or early July), Sulak called the Corporate Compliance Hotline to report what Ochoa had told him.  Sulak Dec., ¶¶ 7-8.  The Corporate Compliance Hotline is a resource employees can call to "have a complaint addressed, either anonymously or in person confidentially outside the chain of command."  Exhibit 7, Deposition of Andrew "Andy" Tunstall ("Tunstall Depo."), p. 34.  Per BASF's EEO policy, this is one of the avenues for employees to report discrimination.  Exhibit 8.

At the time, the Beaumont Site did not have an on-site Human Resources representative.  Sulak Depo., p. 59.  When Sulak called the hotline he was told he indeed had an obligation to report what Ochoa told him, even though he expressed concerns that he would be fired for doing so.  Sulak Dec., ¶ 9.  He was assured that the company protects employees in situations like this.  *Id.*  Sulak conferred with Ochoa, and she told him she wanted to make a formal complaint.  Sulak Depo., p. 60.  Sulak let Ochoa use his office to make a call herself.  Sulak Depo., p. 35.  Sulak gave her the name and number of the person he had spoken with about this situation.  Sulak Dec., ¶ 10.

Local management knew that Sulak had participated in Ochoa's sexual harassment

---

[1] BASF denies this, but admits it *was* a common practice at the Beaumont site to assign interns a mentor to help them adapt and to answer any questions they might have.  Brinkman Depo., pp. 28-29.  Brinkman, the Site Manager, had no reason to dispute Sulak's assertion that he was assigned to be Ochoa's mentor.  *Id.* at 25.

complaint.  Sulak knows that because sometime after Site Director Judy Brinkman mentioned to Sulak that she knew he had helped Ochoa.  Sulak Depo., p. 53.

C.   **Sulak is Placed On, But Successfully Completes, a Performance Improvement Plan.**

Shortly before the Ochoa complaint, around May 2018, Sulak was placed on a Performance Improvement Plan.   According to corporate representative Andy Tunstall, "a performance improvement plan is an effort to, one, provide detailed feedback to an employee" and to "set up meetings for discussion around those topics as the employee attempts to improve." Tunstall Depo., p. 49.  Put another way, "it provides direct and specific feedback to the employee in an effort to help them improve, and, two, it provides some opportunity for the employee to meet with the manager on a regular basis to discuss…the progress." *Id*.  The PIP set forth certain performance metrics for Sulak to meet over the course of 90 days. Ex. 9, Performance Improvement Plan ("PIP").  The PIP required that Sulak meet with his direct supervisor, Mark Screen, and Clay Gilbert, every Wednesday at 8:00 a.m. to discuss Sulak's progress. Ex. 9.  These meetings were not optional.  Tunstall Depo., pp. 59 and 100.

These meetings were supposed to be an important factor in determining whether Sulak was successfully completing the PIP.  Tunstall Depo., p. 57.  Yet it is undisputed that both Screen and Gilbert missed several of these required meetings.  Tunstall Depo., p. 62.  Meanwhile, Screen misrepresented to Tunstall that they *were* occurring.  Exhibit 10. ("Clay and I are having weekly meetings with Robert discussing his performance and specific tasks listed in the PIP.").

On July 2, 2018, about halfway through the PIP (and right around the time that Sulak was reporting Ochoa's sexual harassment report to the compliance hotline), Screen reported to Tunstall that Sulak was "putting forth more effort and is making progress."  Ex. 10.  He expressed that "[w]e are hopeful at this point, but still evaluating." *Id.*  Screen reported that he and Gilbert were

4

having weekly meetings with Sulak and discussing his performance and specific tasks listed in the PIP.  *Id*.  Screen gave no indication that Sulak was failing to improve his performance or to accomplish the tasks listed in the PIP.  In other words, BASF's documentation indicates that Sulak was complying with the performance plan and making progress.  Again, this was right as Sulak was reporting Screen's sexual harassment to the hotline.

On July 16, Screen's reporting to Tunstall took an abrupt turn to the negative.  Exhibit 10. This would have been around 2-3 weeks after Sulak called the hotline for Ochoa, followed by Ochoa's own complaint about Screen.  Tunstall was immediately suspicious about both the content of Screen's email and the submitted documentation.  Tunstall responded:

> These are a bit hard for me to follow… especially with the hand written stuff. Normally, we look to have the updates, dated in a bi weekly, by meeting date format. Perhaps on the tracking sheet we provided, but any date format is acceptable. These should also be organized by the 8 or 9 performance metrics we gave him. In addition, if Clay was handling some meetings or is responsible for some notes, I like to have those listed under Clay's name, that will also help.

Exhibit 10.  Not only that, but Tunstall asked:

> Last, I'm also a bit concerned that the last time we spoke the progress seemed okay, at least, minimally… has anything changed recently?

*Id.*  What the chronology shows had changed, of course, is that Sulak had just a few weeks earlier reported Screen's sexual harassment of Ochoa.  And viewed in the light most favorable to Sulak, it appears that Tunstall knew it.  We see this in his response to Screen where he predicted that Sulak would challenge any "termination effort" and, thus, Screen needed to do everything necessary to "make a case" against Sulak:

> I'm sorry to ask, but this employee will likely challenge a termination effort, and therefore, we need to have our "I"s dotted and "T"s crossed to make a case. This is especially important since you are asking to terminate the program a full month early.

*Id.*  Tunstall already knew Sulak would "likely challenge a termination effort".  *Id.*  Importantly, Tunstall viewed Screen as agitating to get rid of Sulak even before the PIP ended.  *Id.*

BASF did not terminate Sulak per Screen's urgings, though.  The PIP was dated May 18 and was to last ninety days.  Tunstall Depo., p. 123.  This meant the PIP expired on August 16. According to the corporate representative, Tunstall, nobody told Sulak when it ended whether he had successfully completed it.  *Id.* at 124.  Nor, to Tunstall's knowledge, did anyone tell Sulak that he had failed to satisfy the PIP.  *Id.* at 124-25.  In fact, Sulak was scheduled to be on vacation the week the PIP ended.  Sulak Depo., p. 109-10.  Screen was not around so Sulak met with Clay Gilbert before leaving to find out what the outcome was.  *Id.*  Gilbert gave him no indication that he had failed to meet the PIP's requirements.  *Id.*  Rather, he assured Sulak that he would be fine (at least as long as he did whatever Gilbert told him to do).  *Id.*  Even after Sulak returned from vacation, he still wasn't told that he had failed to satisfy the PIP.  Sulak Dec., ¶ 12.  A few weeks went by and discussions or meetings about the PIP completely stopped altogether.  *Id.*  From this, a reasonable factfinder could conclude, as Sulak did, that he had successfully met the PIP's requirements.

## D.     Brinkman Threatens Employees with "Consequences" if They Call the Corporate Compliance Hotline.

On September 6, 2018, a few weeks after the PIP ended, BASF held a sitewide communications meeting at the Beaumont Site.  Exhibit 5, ¶ 2.  Brinkman freely admits discussing at that meeting "the amount of calls recently made to the BASF Corporate Hotline".  *Id.* at ¶ 3. The summary judgment record, of course, contains evidence of at least two recent calls – Sulak's and Ochoa's.

What she said about the "amount" of calls was not positive.  She told the gathered employees that there had been too many, that they were causing negative attention for her site, and that they needed to stop.  Sulak Depo., p. 31.  Brinkman outright threatened that if the employees called the hotline there would be "consequences".  *Id.*  Sulak, having just helped Ochoa with her

sexual harassment complaint – something Brinkman had acknowledged knowing about – was deeply concerned about these comments. Sulak Dec., ¶ 14.  He thought they were a warning against employees from complaining, which he knew could be illegal.  *Id.* at ¶ 15.

Shortly after, during a meeting in the office of Kevin Rickert, Sulak heard other employees expressing concerns, as well.  Sulak Depo., p. 42-43.  It was the general consensus of everyone in attendance.  *Id.*  Sulak does not remember the names of anyone else present other than Rickert and a supervisor named Joe Green (who told Sulak that he felt Brinkman was discouraging employees from using the hotline), but there were others present in Rickert's office.  *Id.*

Sulak took his retaliation concerns directly to Brinkman on September 11, 2018.  Sulak Depo., pp. 39-40; Sulak Dec., ¶ 16.  Brinkman became agitated when questioned about her comments about calls to the corporate compliance hotline.  Sulak Depo., p. 40.  He explained that "yes, you told us we could call it, but you also said there would be consequences." *Id.*  Brinkman – who already knew about Sulak's recent involvement in one such call – replied: "[Yes], there will be." *Id.*

And there were.  As discussed in greater detail below, Brinkman fired Sulak two days later.

### E.    Brinkman Cleans House, Firing Both Screen and Sulak.

At a morning team meeting on September 13, Clay Gilbert announced that Screen had been terminated the prior evening for violating company policy and that he (Gilbert) would now be the acting FFP Manager.  Sulak Depo., p. 60; Sulak Dec., ¶ 17.

Screen was fired for multiple instances of inappropriate behavior with female employees, including Ochoa and Jana Truett.  Brinkman Depo., p. 72.  Screen, it seems, had sent Truett "some very inappropriate pictures" in which, euphemistically speaking, "[a] portion of his body was sticking out in a very inappropriate-type manner." *Id.*  The harassment of Truett occurred *after*

the Ochoa complaint, which itself had resulted in "a very stern written warning that those behaviors that he had [sic] were inappropriate and they would not be tolerated." *Id.* at 73.  Despite having fired him for harassing multiple women, Brinkman obtusely refuses to classify Screen as the serial harasser he was. *Id.* at 74-75.

Brinkman decided to clean house that week, starting with her serial-harassing direct-report (Screen) and then moving on to the employee (Sulak) who she knew had recently called the hotline on Ochoa's behalf and then came to her with retaliation concerns less than one day earlier.  To that end, on the morning of September 12, Tunstall had emailed Brinkman and Gilbert giving his approval for Sulak's firing.  Exhibit 11.  Around mid-day, Brinkman then emailed Anne Berg, VP of Manufacturing, about Sulak. *Id.*  Her email began by saying "[n]othing like having two at the same time", which of course suggests a linkage between the two firings.  She went on: "In addition to Mark Screen, I have Robert Sulak to terminate.  We hadn't talked about this one so I didn't want you to be surprised." *Id.*  Viewed in the light most favorable to Sulak, this suggests some real spontaneity, that she had only just decided that Sulak needed to go.  She then misrepresented to Berg that Sulak "isn't meeting the requirements of the PIP." *Id.*  Using the classic passive voice, she then said "[t]hey have been working with the MRT team and the decision was made to terminate." *Id.*

Her attempt to shift responsibility via the passive voice notwithstanding, it is undisputed that the decision to terminate Sulak was hers and hers alone.  Brinkman Depo., pp. 24 and 68-69; Tunstall Depo., p. 16.  Tunstall says this decision should have been made, at least in part, on the information provided to her by Screen and Gilbert after the PIP.  Tunstall Depo., p. 80.  But Brinkman says that she never reviewed any of Screen or Gilbert's PIP-related notes, and nor did she even review the PIP before making her decision.  Brinkman Depo., 68.  She variously testified

8

at her deposition that she based the decision on a recommendation from Andy Tunstall, and also that it was based on the recommendation of Tunstall *and* Screen. *Compare id.* at 63 and 64. She admits, though, that Tunstall would have had no direct knowledge about Sulak's work performance. *Id.* at 64. So ultimately, she was basing her decision on the recommendation of a serial harasser she had just fired and who, the record shows, had been actively agitating to fire the person (Sulak) who helped kick off Screen's own workplace travails. A reasonable factfinder could find her credulous reliance on Screen to be completely unbelievable.

The next day, September 13, Sulak was summoned to a meeting with Brinkman and Gilbert. Sulak Depo., p. 46. Brinkman told Sulak his performance was not meeting expectations. Sulak Depo., p. 47. This was a surprise to Sulak because his PIP had ended almost a month before and he had heard nothing about it since then (save for a comment Brinkman had lobbed at him when they met on September 11). Sulak Dec., ¶ 12. Sulak challenged Brinkman to identify how his performance was not meeting expectations. *Id.* She dismissively waved her hand, offered no explanation, and instead stated "[at] this point, it doesn't matter. All you need to know is, you're no longer employed here. You are fired." Sulak Depo., p. 47.

This lawsuit followed.

<u>**ARGUMENT**</u>

### A.    Summary Judgment Standard.

"The Fifth Circuit has made it clear that summary judgment is strongly disfavored in Title VII actions." *Perales v. American Retirement Corp.,* 2005 WL 2367772, *10 (W.D. Tex. Sept. 26, 2005) (*citing Fierros v. Texas Department of Health,* 274 F. 3d 187, 190-91 (5th Cir. 2001). In *Fierros,* the Fifth Circuit noted the Supreme Court's emphasis on "the paramount role that juries play in Title VII cases, stressing that in evaluating summary judgment evidence, courts must

refrain from the making of 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts,' which 'are jury functions, not those of a judge.'" *Fierros,* 274 F. 3d at 190-91 (*citing Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000)).

*Reeves,* of course, requires not just that all reasonable inferences be indulged in favor of the nonmoving party, but also that the trial court "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150-51. It has long been trie that summary judgment is supposed to be used sparingly "[w]here motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Fortner Enterprises, Inc. v. U.S. Steel Corporation,* 394 U.S. 495, 500 (1969); *see also Turco v. Hoechst Celanese Chemical Group, Inc.,* 906 F. Supp. 1120, 1126-27 (S.D. Tex. 1995), *aff'd sub nom,* 101 F. 3d 1090 (5th Cir. 1996); *Honore v. Douglas,* 833 F.2d 565, 569 (5th Cir. 1987) (observing that "summary judgment is ill-suited for credibility determinations" and "[i]t is likewise an inadequate procedure for sorting out nebulous questions of motivation").

### B.    The Court Should Deny Summary Judgment

Defendant raises essentially three summary judgment grounds, all of them meritless. It first challenges Sulak's prima facie case, saying he has no evidence of a protected activity or causation. These arguments are meritless because the motion *admits* to the first, and there was a close temporal connection – less than three months for the hotline call and less than two days for the September 11 retaliation complaint – between Sulak's protected conduct and Sulak's termination. Second, it says Sulak has no evidence of pretext, an argument belied by a plethora of facts, including BASF's own failure to follow through with the PIP's required weekly meetings; Sulak's successful completion of the PIP; Screen's suspicious agitation for Sulak's firing mid-way through the PIP; Brinkman's expressed hostility to employees calling the hotline; and her

knowledge that Sulak had done so regarding Screen, who she sacked one day before firing Plaintiff.  Finally, Defendant offers two arguments about damages.  One is a bizarre and meritless 'failure to mitigate' argument that does not even remotely meet the elements of that affirmative defense.  And the other is that Plaintiff cannot recover mental anguish damages, even though Defendant has presented Plaintiff's own testimony that he has experienced panic attacks. Defendant's motion should be denied.

1.     **Sulak can establish a *prima facie* case of retaliation.**[2]

To demonstrate retaliation, a plaintiff must show that 1) he engaged in conduct protected by Title VII; 2) he suffered a materially adverse action; and 3) a causal connection exists between the two.  *Cabral v. Brennan*, 853 F.3d 763, 766-67 (5th Cir. 2017).  The first element requires that the Plaintiff either oppose practices made illegal by Title VII or that he participate in some proceeding under the statute.  The third element may be satisfied by showing a close temporal connection between the employee's protected activity and the adverse action taken against him. *Feist v. Louisiana,* 730 F.3d 450, 454-55 (5th Cir. 2013).  The Fifth Circuit has explained that a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes.  *Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir. 2001).  With these principles in mind, Plaintiff now turns to the two elements Defendant challenges.

a.     **Plaintiff engaged in a protected activity when he assisted an intern in making a complaint of sexual harassment against her and Sulak's Supervisor.**

Intern Emily Ochoa came to Sulak, her mentor, because Screen was sexually harassing her. She explained that he was making unwelcome advances on her and she specifically described an

---

[2]Defendant's motion includes a multi-page argument about whether Plaintiff has direct evidence.  If it were a direct evidence case there would be no need to demonstrate a prima facie case under the *McDonnell Douglas* burden-shifting standard.  *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 192 (5th Cir. 2001).  This is not a direct evidence case and Sulak has never alleged that it was.

incident where Screen had contrived to meet with her at an isolated location behind the plant and then made advances on her there.  Sulak Dec., ¶ 6.  Sulak recognized this as sexually harassing conduct, *id.*, and so he set out to help her, which he believed he was required to do.  So he called the company's corporate hotline, reported what Ochoa had told him, and then he provided her with the contact information and a safe private space in which to call and make a formal complaint directly.  *Id.* at ¶¶ 8-11.  According to Defendant's own EEO policy, calling the Corporate Compliance Hotline was one of several options if BASF employees needed to raise EEO-related complaints.  Exhibit 8.

Despite these facts, Defendant absurdly argues that Sulak's conduct was not protected under Title VII or the TCHRA because he did not believe he was opposing conduct those laws make illegal.  It argues this despite his deposition testimony, which it is well aware of and even points to in its motion, that he "observe[d] or bec[a]me aware of" information that Screen was harassing Emily Ochoa.  Sulak Depo., p. 26.  He described later becoming aware of Screen's sexual harassment of women being somewhat common knowledge in the office, at least in some circles.  *Id.* at 26-28.  He testified that he believes that sexual harassment is unlawful under state and federal law.  *Id.* at 28.  And Defendant essentially admits that it fired Screen for multiple acts of sexual harassment.  Brinkman Depo., p. 50; Tunstall Depo., 20.

To sum up, Ochoa came to Sulak, her mentor, with concerns about being harassed by Screen.  She offered a specific example, among others, of Screen isolating her at some location behind the plant and coming on to her.  She expressed her discomfort to Sulak.  Sulak knew sexual harassment was illegal.  Indeed, any reasonable person would view this to be potentially sexually harassing behavior.  After all, women are not required to walk a sexual gauntlet for the privilege of having a job. *Rodriguez v. City of Houston*, 250 F. Supp.2d 691, 702 (S.D. Tex. 2003), *quoting*

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

Under Title VII, the reasonable belief standard is an objective one. *Allen v. Administrative Review Board*, 514 F.3d 468, 477 (5th Cir. 2008). Sometimes reasonable belief may be determined as a matter of law. *Id.*; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427-28 (5th Cir. 2000). But that is not always the case, and certainly not when there exists a genuine dispute of material fact. *Allen*, 514 F.3d at 477. So, Defendant's argument that these facts could not support an objective good faith belief that sexual harassment might be going on is just meritless and wrong.

Then there is the all-hands meeting on September 6, where Brinkman complained about the quantity of hotline calls, complained it was making her plant look bad, and warned employees that there would be "consequences" for such calls. Title VII's antiretaliation provision exists to police conduct that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Importantly, retaliatory intent may be inferred from threats to retaliate against people who complain. *EEOC v. Rite Way Service, Inc.*, 819 F.3d 235, 245 (5th Cir. 2016).

Sulak was concerned when he heard Brinkman's words that they might dissuade co-workers with complaints from coming forward with them. Sulak Dec., ¶ 15. He thought they were an intimidation of the workforce. Sulak Depo., p. 30-31. He was concerned for himself, since he had made such a call just a few months before. *Id.* at ¶ 14. And he had also heard such concerns expressed by co-workers. *Id.* at ¶ 15. So he went to Brinkman on September 11 to complain that her words were coming across as retaliatory. *Id.* at ¶ 16. And the next day, she decided to fire him. A reasonable factfinder could conclude that Sulak had an objective, good faith belief that Brinkman's words might be a threat of retaliation and that his complaint to her was protected.

The most incredible aspect of Defendant's argument is that it ultimately concedes at p. 21

"that assisting Ms. Ochoa in filing a complaint against Mr. Screen and objecting to Ms. Brinkman's comments are protected activities under Title VII and the TCHRA." Thus, Defendant's argument here borders on the sanctionable. *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988) ("When a party has obtained knowledge through the course of discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in responding to the motion, he defeats that purpose; and, more importantly, violates the rules of procedure which govern the conduct of trial, specifically Rule 11."). Defendant knows Ochoa came to Sulak reporting sexual harassment; that Sulak reported it via the hotline and otherwise assisted Ochoa; that it disciplined Screen for harassing Ochoa and eventually fired him for having harassed multiple women; and that Sulak considered Brinkman's September 6 threat of "consequences" to be threatening retaliation against people who complained to the hotline (one such complainant being him). Sulak Dec., ¶ 16. Summary judgment should be denied.

### b. Sulak has evidence of causation.

Causation for prima facie case purposes can be inferred from a close temporal connection between the protected act and the adverse action. *Swanson v. General Services Administration*, 110 F.3d 1180, 1188 (5th Cir.), *cert.* denied, 522 U.S. 948 (1997). The Fifth Circuit has found periods as long as four months to be close enough to infer retaliation. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). Two and one-half months has also been found sufficient. *Richard v. Cingular Wireless LLC*, 233 Fed. App'x 334, 4 (5th Cir. 2007).

The summary judgment record establishes that Sulak complained about the sexual harassment of Ochoa in late June or early July 2018 and was fired on September 13, so approximately 2 ½ months (perhaps 2 ¾) later. This is a short enough lapse of time to establish causation, or at least a triable issue of material fact.

But the record also establishes that Sulak complained to Brinkman about her retaliatory comments on September 11, that the next day she received permission to fire him, and that she let him go one day after that.  As temporal connections go, it is hard to see how they could get much closer.  This is critical because the very strength of the *prima facie* can sometimes be highly relevant at the later pretext stage.  *Reeves,* 530 U.S. at 148-49; *Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015).  Close temporal proximity on its own can even establish the ultimate question of "but for" causation.  *See Rite Way,* 810 F.3d at 244 (jury could infer ultimate but for causation from, among other things, "the strong temporal proximity between [plaintiff's] written report and her termination."); *Cristain v. Hunter Buildings & Mfg., L.P.*, 908 F.3d 962, 964 (5th Cir. 2018) (describing two week gap between protected act and adverse action as "stark" temporal proximity); *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011) ("In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext.").[3]

Plaintiff must make two more points about prima facie causation.  First, Defendant seems to argue that Sulak's termination was a committee decision and, thus, there could be no retaliation unless Brinkman and Tunstall and Screen and Gilbert each knew about Sulak's protected conduct.  This is nonsense because Tunstall and Screen and Gilbert decided nothing.  It is undisputed that Brinkman alone made the decision to fire Sulak.  Brinkman Depo., pp. 24 and 68-69; Tunstall Depo., p. 16.  Brinkman admitted to Sulak that she knew about his involvement in the Ochoa

---

[3]The motion also includes a section at p. 23 seemingly arguing that Plaintiff cannot show causation because Defendant claims that Brinkman "requested approval" to fire Sulak on September 10, one day before Sulak complained about her retaliatory "consequences" threat.  For prima facie case purposes, Sulak closes the circuit with evidence that he complained about Ochoa in late June/early July and about Brinkman's threat on September 11 and was fired on September 13.  To the extent Defendant is arguing that it could not have been retaliation for the September 11 complaint, that would seem more to be a proffered excuse, e.g., that it had already decided to terminate and, thus, could not have been caused by the September 11 complaint.  This will be addressed in the pretext section, below.

sexual harassment situation.  Brinkman knew about Sulak's September 11 complaint when she obtained permission and informed Berg on September 12 and fired Sulak on September 13.  Defendant's 'knowledge' argument is meritless.

### 2. BASF's proffered excuse for terminating Sulak is pretextual.

A prima facie case plus proof of pretext entitles a jury to find discrimination. *Reeves,* 530 U.S. at 148-49.  It is not the trial court's role to weigh credibility or to otherwise decide how the case should come out.  The entire record must be viewed in the light most favorable to the non-moving party.  All inferences must be indulged in his favor.  The strength of the prima facie should be considered, as should comments, conduct, or evidence inconsistent with the employer's excuse.

Defendant's proffered excuse is simply untrue.  First, Defendant put Sulak on a performance plan, it ran for 90 days, and then it ended.  When it ended, nobody told Sulak he had failed to complete it.  Nobody told him his performance continued to be inadequate in any way.  In fact, he had gone to Gilbert the week before it ended – since he was going to be on vacation that week – to find out where he stood.  Gilbert assured him that he was fine.  Gilbert's assurance stands in sharp contrast with the company's insistence that he wasn't fine.

Second, the timing belies the company's excuse.  The performance plan ended on August 16.  BASF *claims* it decided to fire him on September 10.  There is no documentation of any such decision until September 12.  So there exists an unexplained 25-27 day gap.  During this nearly month-long delay, no one said anything further to Plaintiff about his performance.  If Sulak *truly* failed the performance plan, then why did the company keep him on for another month?  It makes no sense.  This is evidence of pretext.

Third, BASF's contention today that it could not have retaliated because of the September 11 complaint because Brinkman decided to fire Sulak on September 10 is a completely new

16

assertion, found nowhere in its position statement submitted to the EEOC.  *See* Exhibit 12.  Such

a shifting explanation permits an inference of pretext.  *Burton v. Freescale Semiconductor, Inc.*,

798 F.3d 222, 237 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven Up Bottling Group., Inc.*,

482 F.3d 408, 415 (5th Cir. 2007)).

Fourth, as noted, the performance plan had ended on August 16.  Yet when Sulak delivered

his complaint to Brinkman on September 11, she became agitated and immediately turned to

whether he was still meeting Screen and Gilbert pursuant to his performance plan.  Sulak Dec., ¶

16.  Sulak was not continuing those meetings because the performance plan had ended.  He told

her that.  *Id.*  She responded that he needed to keep having those meetings.  *Id.*  A jury could

certainly be suspicious of Brinkman responding to a retaliation complaint by resurrecting a

completed PIP that had been over and done with for a month.

Fifth, a jury could even be more suspicious with Brinkman telling Sulak he needed to keep

having those weekly Wednesday meetings.  According to BASF's motion, this conversation

occurred one day *after* Brinkman had supposedly decided to fire him.  Why, if she had already

decided to terminate, would she say anything to him about continuing to have weekly performance

meetings that she knew were never going to occur?  It makes no sense whatsoever.  There are two

alternative explanations, either of which the factfinder could believe.  One is that BASF is lying

about the timeline, and that no termination decision was made until after Sulak made his protected

retaliation complaint on September 11.  The other is that Brinkman was workshopping a

termination excuse, blissfully unaware that the PIP had ended nearly a month earlier.  Either way,

it casts serious doubt on both the assertion that Sulak was still having performance problems and

also that she had decided to fire him – quite conveniently – the day before.  And, since her

comments suggest that no decision had yet been made and documentary evidence establishes that

she only obtained permission (and informed Berg) the next day, the close temporal connection is not even 24 hours, meaning the connection alone is enough to show pretext. *Rite Way,* 810 F.3d at 244 (jury could infer ultimate but for causation from, among other things, "the strong temporal proximity between [plaintiff's] written report and her termination."); *Cristain,* 908 F.3d at 964; *Dawson*, 630 F.3d at 937.

Sixth, even putting aside that the PIP ended successfully, it also bears mentioning that the PIP required weekly meetings between Sulak and his management.  This was a two-way street, meaning that Sulak could not have the meetings without his management's participation.  But the evidence is undisputed – and Defendant even highlights this at p. 25 of its motion – that Screen and Gilbert failed to show up for several of these meetings.   But meanwhile, Screen was misrepresenting to Tunstall that they were meeting with Sulak weekly.  Exhibit 10.  This, in turn, casts suspicion on all of Screen's alleged reports about Sulak's work performance.

Seventh, the documentary evidence reveals a suspiciously mixed bag about Sulak's performance – or Screen's alleged view of it – while the PIP was going on.  Screen reported to Tunstall about halfway through that Sulak was showing improvement, that he was "putting forth more effort" and "making progress".  Exhibit 10.  Two weeks later – and shortly after Sulak had reported Screen's sexually harassing conduct – his reports to Tunstall took a negative turn, one that confused and concerned Tunstall.  *Id.*  Tunstall criticized the format and organization of Screen's reporting.  *Id.*  He expressed concern about why the change in outlook and asked "has anything changed recently?".  *Id.*  If Tunstall was questioning the bona fides of Screen's reporting, then surely the jury can, as well.

Eighth, Tunstall's email to Screen suggests that Tunstall was aware of Sulak's report to the compliance hotline.  He does not say this specifically, but he told Screen that Sulak "will likely

18

challenge a termination effort", so he stressed that they need to make sure they had everything line up "to make a case" against Sulak. Exhibit 10. Why would they need to "make a case" about anything if Sulak's performance truly was substandard?

Ninth, Tunstall and Brinkman cannot keep their story straight. According to Brinkman, she made the decision to fire Sulak because of a recommendation from Screen and Tunstall. Brinkman Depo., p. 63-64. According to his declaration, though, Screen was nowhere to be found when they allegedly decided to terminate. The story Tunstall tells is that on September 10, he and Clay Gilbert and Brinkman held a phone call to discuss Plaintiff's PIP performance. He says that the three of them "all agreed that Plaintiff should be terminated." Defendant's Exhibit G, Tunstall Dec., ¶ 10. He does not say why. Not involved was Screen, understandably so because he was about to be fired. But the overall point is that Tunstall and Brinkman are telling two different stories about how and why Sulak was terminated. If these facts conflict, the question is reserved for the jury.

Tenth, and somewhat relatedly, Defendant's Exhibit M contains a series of emails discussing the idea of terminating Plaintiff. But far from exonerating BASF, these exchanges undermine it. As Tunstall wrote to Gilbert on September 7, the plan was to meet "to develop a termination rationale", even though their documentation was "mixed in commentary" about Sulak. Defendant's Exhibit M. They weren't meeting to decide whether to terminate. They were meeting to cherry-pick criticisms of Sulak in order to justify his termination. A reasonable factfinder could therefore view whatever happened on September 10 to be nothing more than a setup or, as Tunstall had highlighted earlier, dotting their I's and crossing their T's to build a case against Sulak.

Eleventh, Sulak has unmistakable evidence of Brinkman's hostility to his protected acts. He had called the hotline and helped another employee call the hotline. Brinkman complained

19

about this at the September 6 sitewide meeting, saying there were too many, that they were making her plant look bad, and that there would be "consequences" for making such calls.  The jury could easily regard that as evidence of her retaliatory intent, irrespective of whether the termination decision was made before or after September 11.  But beyond that, Sulak has also testified about how agitated Brinkman became when he called her on these retaliatory threats at their September 11 meeting.  This, too, suggests her discomfort with the fact that Sulak was willing to stand up to discrimination and retaliatory threats.[4]

Twelfth, and returning to the actual termination excuse, when Sulak challenged Brinkman at the termination meeting to say *how* his performance remained deficient, she was unable or unwilling to offer any substantive response.  If she truly was terminating him for performance reasons, surely she should have been able to put some meat on the bone.  She couldn't and the factfinder could regard this as a reason to disbelieve her testimony.

Finally, there exists an incredibly nonsensical dose of credulousness in Brinkman and BASF's story here.  Brinkman knew that Sulak had been a whistleblower regarding Screen's sexually harassing conduct.  It had triggered an investigation that earned Screen a slap on the wrist and, ultimately, led to his termination one day before Sulak.  Brinkman essentially wants this jury to believe that she was putting all her faith in the reporting of a repeat sexual harasser who just so happened to be agitating to fire the person she knew had reported him to corporate compliance.

---

[4]Defendants' motion includes an argument that Brinkman's expression of hostility to people calling the hotline is just a "stray remark" and probative of nothing.  In making this argument, Defendant fails to acknowledge that following *Reeves*, the Fifth Circuit's jurisprudence about so-called stray remarks "must be viewed cautiously." *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 229 (5th Cir. 2000).  Even before *Reeves*, the Fifth Circuit had warned that the entire stray remarks doctrine "is itself inconsistent with the deference appellate courts traditional allow juries regarding their view of the evidence presented and so should be narrowly cabined." *Vance v. Union Planters Corp.*, 209 F.3d 438, 442 n.4 (5th Cir. 2000).  Put simply, it should be up to the jury to decide whether Brinkman's September 6 expression of hostility to those who call the compliance hotline has some bearing on her September 13 firing of Sulak, who had *recently* called the compliance hotline.

Can she really have been so obtuse that she did and does not question the integrity and merit of Screen's supposed evaluation of Sulak's performance?  We already know that Screen was missing several of the PIP-required Wednesday meetings, pushing for termination half-way through the PIP, and that Brinkman herself never looked at any of Screen or Gilbert's notes about Sulak's PIP performance.  Surely a reasonable factfinder could be suspicious that a site manager hostile to hotline complainants might not be giving the straight story about Sulak, including that by the week of September 10 she was putting any stock in what Screen had to say about Sulak.

In short, there are plenty of reasons to disbelieve the company's assertion that Sulak was actually terminated due to performance deficiencies.  The pretext evidence and argument are overwhelming.  Summary judgment should be denied.

### 3.    Defendant is not entitled to summary judgment on its failure to mitigate defense.

Failure to mitigate damages is an affirmative defense upon which BASF bears the burden of proof.  *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 738 (S.D. Tex. 2014) (citing *Ellerbrook v. Lubbock, Texas*, 465 Fed. App'x 324, 337 (5th Cir. 2012)).  To prevail, a defendant must prove that (1) substantially equivalent work was available and (2) Plaintiff did not exercise reasonable diligence to obtain it.  *Sellers v. Delgado Coll.,* 902 F. 2d 1189, 1193 (5th Cir. 1990).

"The reasonableness of a Title VII claimant's diligence 'should be evaluated in light of the individual characteristics of the claimant and the job market.'"  *Sellers,* 902 F.2d at 1193, *quoting Rasimas v. Michigan Dept. of Mental Health,* 714 F. 2d 614, 624 (6th Cir. 1983).  Substantially equivalent employment is that "which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which" the plaintiff had been terminated.  *Sellers,* 902 F.2d 1189 at 1193, *quoting Rasimas,* 714 F. 2d at 624. This issue is not appropriate for summary judgment, which Defendant knows.

First, Plaintiff deposed the company on the factual basis for this defense, and its testimony bears no resemblance to its summary judgment argument.   Specifically, Tunstall said "the Claimant is in the Texas Gulf Cost area.  There certainly are plenty of opportunity there for him to find work and – and plenty of opportunity for him to find work at a level at least as high or higher than – than the current job he held at BASF."  Tunstall Depo., p. 158.  As a Rule 30(b)(6) witness, this testimony of Tunstall binds the company; his answers are its answers.  *See Brazos River Auth. v. GE Ionics, Inc.,* 469 F. 3d 416, 433 (5th Cir. 2006) (citing *United States v. Taylor,* 166 F.R.D. 356, 361 (M.D.N.C. 1996)); ("[A] rule 30(b)(6) designee does not give his personal opinions, but presents the corporation's 'position' on the topic."); *Resolution Trust Corp., v. S. Union Co., Inc.,* 985 F.2d 196, 197 (5th Cir. 1993).  This was just speculative blather, in which the company "identified" no such jobs and no manner in which it says Sulak was not diligent.  Yet in its Motion, Defendant lays out a whole factual theory that it failed to disclose at its deposition.

Even so, Defendant is just wrong.  Sulak immediately set about looking for a job after his termination.  Sulak Dec., ¶ 20.  Sulak quickly found a position with Indorama Ventures as a Production Engineer.  *Id*.  This was the same type of job he was performing at BASF.  *Id.*  As a new employee, he was earning a base salary of $130,000 annually.  Sulak Dec., ¶ 21.  A reasonable juror can infer from this alone that Sulak made a diligent effort.  In *West*, the case cited by Defendants, the plaintiff spent several months attempting to be rehired by his employer who had terminated him before he took any steps to find new employment.  *West v. Nabors Drilling USA, Inc.,* 330 F. 3d 379, 393 (5th Cir. 2003).  Further, he "did not seek work with any drilling company or any supervisor-type employment with any employer." *Id.* at 394.

The facts of the *West* case stand in stark contrast to the evidence in this case.   First, Sulak did not waste any time looking for employment and he looked for and gained employment in the

same industry doing the same type of job he did for Defendant.  Further, Sulak did not rest on his laurels and stick with the first job that came his way.  After about a month of working for Indorama Ventures, Sulak accepted a *higher* paying job as a Senior Technical Engineer with DuPont.  Sulak Dec. ¶ 21.  His starting base salary there was $145,976.00 annually, or around $16,000 more per year than at Indorama.  *Id.*  Additionally, the DuPont plant is located only 10 miles from Sulak's home which significantly reduced his commute.  *Id.* Indorama is located approximately 40 miles from Sulak's home, as was BASF.

Defendant has failed to present any evidence satisfying the two elements of a failure to mitigate defense.  Sulak quickly found comparable work, and then quickly moved to a higher paying job.  Defendant's argument should be rejected.

### 4.    Defendant is not entitled to summary judgment on Plaintiff's claim for compensatory damages.

A Title VII claimant's available remedies include compensatory damages for mental anguish.  *Burrell v. Crown Central Petroleum, Inc.,* 177 F.R.D. 376, 379 (E.D. Tex. 1997).  The standard is that "if a reasonable person, under and objective standard, would be harmed by the alleged conduct, then the plaintiff may receive an award for the emotional damages naturally flowing from that injury.  *Id.*  The "Fifth Circuit does not require medical testimony or medical records to support a claim for mental anguish in Title VII" cases.  *Id.* at 383.  An award of compensatory damages for emotional distress requires specific evidence of actual harm, and the Fifth Circuit has held that the testimony of the plaintiff alone can be enough to satisfy the requirement.  *Williams v. Trader Pub. Co.,* 218 F.3d 481, 486 (5th Cir. 2000).

Defendant argues for summary judgment on Plaintiff's claim for compensatory damages, only by ignoring Sulak's testimony about experiencing panic attacks – in the evidence it submitted

– as a result of BASF's retaliatory termination. Defendant's Exhibit A, p. 148.[5]   After he was terminated, Sulak was incredibly stressed about losing his job and the financial pressure to quickly find a new one to support his large household.  Sulak Dec., ¶ 20.  Because of this stress, he started experiencing some panic attacks.  *Id*.  When he would have these episodes, his heart would race, he would experience stomach pain and nausea, sweating, chills, difficulty breathing, chest pain, and sometimes dizziness.  *Id*.  Sulak also testified that he had talked about his mental anguish with his wife.  Sulak Depo., p. 139.  His wife helped him handle his feelings and symptoms.  Sulak Dec., ¶ 20.

Sulak has specific evidence of actual harm he suffered because of his termination. The testimony Sulak gives regarding the onset of panic attacks after his termination surely raises a genuine issue of material fact that could entitle Plaintiff to recover compensatory damages.

A reasonable fact finder could conclude that experiencing panic attacks supports a finding of mental anguish damages in this case, therefore, summary judgment should be denied as to Sulak's claim for compensatory damages.

### CONCLUSION

Defendant's Motion for Summary Judgment should be denied.

---

[5] BASF harps on Sulak's discovery objection that his medical records weren't discoverable because he seeks only "garden variety" mental anguish damages.  Nothing about making an objection about the discoverability of medical records suggests there are no such damages.  *See Burrell,* 177 F.R.D. at 380 (noting other courts have held that mental anguish claims in Title VII suits do not place the physical or mental condition of a plaintiff in controversy, so long as the mental anguish claims are ordinary, "garden-variety" claims that an objective fact finder can evaluate); *see also Lahr v. Fulbright and Jaworski, L.L.P.,* 164 F.R.D. 204, 210 n. 2 (N.D. Tex. 1996).

Respectfully submitted,

DOW GOLUB REMELS & GILBREATH, PLLC

_s/ Lauren Van Ness_
Andrew S. Golub
S.D. Tex. I.D. No. 13812
asgolub@dowgolub.com
Lauren Van Ness
S.D. Tex. I.D. No. 3633957
lvanness@dowgolub.com
2700 Post Oak Blvd., Suite 1750
Houston, Texas 77056
Telephone: (713) 526-3700
Telecopier: (713) 526-3750

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that on March 11, 2022, a copy of this instrument was served via ECF on all counsel who have appeared in this matter.

_s/ Lauren Van Ness_
Lauren Van Ness